UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH JACKSON,

        Petitioner,

   v.

ROBERT HOREL, warden,

        Respondent.
                                          /

No. C 07-1334 SI (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Joseph Jackson, an inmate at Pelican Bay State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Jackson was convicted upon a guilty plea in Los Angeles County Superior Court of two counts of kidnapping and admitted to using a knife during the offenses. He was sentenced in 1982 to life in prison with the possibility of parole, plus one year. His habeas petition does not challenge his conviction but instead challenges a January 27, 2005 decision of the Board of Prison Terms, now known as the Board of Parole Hearings ("BPH"), that found him not suitable for parole. The 2005 hearing was Jackson's tenth parole hearing, and was conducted at a time when he was more than 22 calendar years into his life sentence.

The BPH identified the circumstances of the commitment offense, Jackson's prior criminality and unstable relationships, his need for further programming, and the inconclusive psychological evaluation as the reasons for the determination that Jackson was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Resp. Exh. 3 (reporter's transcript of January 27, 2005 BPH hearing (hereinafter "RT")) at 50-52. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Jackson sought relief in the California courts. He filed a habeas petition in the Del Norte County Superior Court, where it was denied. Resp. Exh. 12. The California Court of Appeal denied his habeas petition. Resp. Exh. 14. The California Supreme Court summarily denied his habeas petition. Resp. Exh. 14.

Jackson then filed his federal petition for a writ of habeas corpus. The court found cognizable a due process claim that there was not sufficient evidence to support the decision. Respondent filed an answer and Jackson filed a traverse. The matter is now ready for a decision.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at Pelican Bay State Prison in Del Norte County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).  Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.   Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill,

3

472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129. As a matter of state law, the decisionmaker's decision must also satisfy the "some evidence" standard of review. See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous"); In re Rosenkrantz, 29 Cal. 4th 616, 676-77 (Cal. 2002), cert. denied, 538 U.S. 980 (2003).

A critical issue in parole denial cases concerns the parole authority's use of evidence about the commitment offense that led to the conviction. Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d 846 (9th Cir. 2007).[1] Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as

---

[1] En banc review is now pending in a fourth case regarding the some evidence standard, Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008). The order granting en banc review states that the panel opinion is of no precedential value.

4

improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole. Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853.² Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs: it is not the holding of the case. The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process. Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

The upshot of these three cases is that the BPH (and hence the Governor) can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable

---

²Interestingly, Irons was referring the actual number of years the inmate had been in prison and not the fictional number of years based on reductions for time credits. In Irons, the inmate had been in custody 16 years on his 17-to-life sentence, having been convicted in 1985 and challenging at 2001 parole decision.

1 behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a
2 crime committed 50 years ago is less probative of a prisoner's current dangerousness than one
3 committed 10 years ago. Not only does the passage of time in prison count for something,
4 exemplary behavior and rehabilitation in prison count for something according to Biggs and
5 Irons. Superintendent v. Hill's standard might be quite low, but it does require that the decision
6 not be arbitrary, and reliance on only the facts of the crime might eventually make for an
7 arbitrary decision.[3]

8 What little guidance has come from the Supreme Court suggests that judicial review
9 should be extremely deferential to the original decision-maker in the parole context. In addition
10 to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court
11 comments suggest that the judiciary should be quite mindful of the subjective and predictive
12 nature of a parole board's decision. See Greenholtz, 442 U.S. at 13. "No ideal, error-free way
13 to make parole-release decisions has been developed; the whole question has been and will
14 continue to be the subject of experimentation involving analysis of psychological factors
15 combined with fact evaluation guided by the practical experience of decisionmakers in
16 predicting future behavior. Our system of federalism encourages this state experimentation."
17 Id.; see also id. at 8.

18 Past criminal conduct is not some arbitrary factor like eye color that has nothing to do
19 with present dangerousness. Recidivism concerns are genuine. See Ewing v. California, 538
20 U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent offenders were
21 arrested again within three years of their release). California's parole scheme does not offend

---

[3]The California Supreme Court recently weighed in on the use of the commitment crime to deny parole in the companion cases of In re Lawrence, 44 Cal. 4th 1181 (Cal. 2008), and In re Shaputis, 44 Cal. 4th 1241 (Cal. 2008). The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety." Lawrence, 44 Cal. 4th at 1191 (emphasis in source). Applying that rule, the court determined that there was not some evidence to deny parole in Lawrence but that there was some evidence to deny parole in Shaputis.

due process by allowing the BPH (and hence the Governor) to predict that an inmate presents a present danger based on a crime he committed many years ago.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to answer the question, "'some evidence' of what?"

B.     <u>State Law Standards For Parole For Kidnappers In California</u>

California uses indeterminate life sentences for persons convicted of kidnapping for robbery. <u>See</u> Cal. Penal Code § 209(b). California's parole scheme described below provides that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPT panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2281, allows for consideration of a wide range of information in determining suitability, <u>see</u> § 2281(b), and lists circumstances

7

tending to show suitability and circumstances tending to show unsuitability, § 2281(c) and (d).[4] The regulation also provides that "[t]he panel shall first determine whether a prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2281(a).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2282. For example, for kidnapping for robbery or ransom, the matrix of base terms ranges from the low of 8, 10, or 12 years to a high of 13, 15, or 17 years, depending on some of the facts of the crime.[5] Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole. The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. In re Dannenberg, 34 Cal. 4th 1061, 1070-71 (Cal.), cert. denied, 126 S. Ct. 92 (2005). Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. See id. at 1070-71; 15 Cal. Code Regs. § 2282(a) ("[t]he panel shall set a

---

[4] The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and serious misconduct while in prison. 15 Cal. Code Regs. § 2281(c). The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2281(d). The circumstances listed as tending to show unsuitability and suitability "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." 15 Cal. Code Regs. § 2281(c) and (d).

[5] One axis of the matrix concerns the kind of harm done to the victim and the other axis of the matrix concerns the circumstances of the kidnapping. The choices on the axis for the harm to the victim include no/minor harm, victim sexually or otherwise seriously assaulted, victim suffered major injuries, or victim died. The choices on the axis for the circumstances of the kidnapping are minor movement, extensive movement, victim taken hostage, and intricate prior planning for the crime. 15 Cal. Code Regs. § 2282(c).

base term for each life prisoner who is found suitable for parole").

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety under the statute and corresponding regulations involves an assessment of an inmate's <u>current</u> dangerousness." <u>Lawrence</u>, 44 Cal. 4th at 1205 (emphasis in source).[6]

C.   <u>Some Evidence Supports The Governor's Decision In Jackson's Case</u>

   1.   <u>The BPH's Decision</u>

The BPH identified the circumstances of the commitment offense, Jackson's prior criminality and unstable relationships, his need for further programming, and the inconclusive psychological evaluation as the reasons for the determination that Jackson was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

<u>Commitment Offense</u>: The crimes were described in the probation officer's report:

> On May 21, 1982 victim Susan Becker and her cousin, Peggy Simon, were returning home from a restaurant at approximately 2:00 a.m. and had just arrived in front of their house located on Birdie Drive in La Verne when a van cut them off and forced them to stop. At this time Tatum and Jackson got out of the van and approached the victims' car. Tatum, holding a loaded revolver, forced his way into the passenger side of the car. Jackson threatened the victims with a knife and also got into the victims' car. The victims screamed which alerted Becker's brother and boyfriend. When they came out to investigate Tatum pointed his revolver at them and told them to get back. They complied with this demand at which time victims were forced to drive way (sic) from the location. Tatum ordered Susan Becker to follow the van in front of her. They drove a short distance during which time Tatum and Jackson robbed the victims of their jewelry. They then had the victims stop their car and they transferred them into the van. [¶] Inside the van Tatum ordered the victims to remove their clothing. Fernandez attempted to unbutton Peggy Simon's pants but was told to wait until they got on the freeway. In the

---

[6] The California Supreme Court's determination in <u>Lawrence</u> that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action. <u>See</u> <u>Hicks v. Feiock</u>, 485 U.S. 624, 629-30 (1988). However, <u>Lawrence</u> does not govern this court's analysis in every respect. This court is not bound by the discussion in <u>Lawrence</u> (<u>see</u> footnote 4, <u>supra</u>) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous. As to that point, <u>Lawrence</u> is persuasive authority, while the Ninth Circuit's holdings in <u>Sass</u>, <u>Biggs</u>, and <u>Irons</u> are binding authority. Also, <u>Lawrence</u>'s determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

9

>meantime the police had been contacted and the van identified. The van was spotted and a chase ensued. The chase lasted a short time and ended when the van crashed into a tree. The five defendants then attempted to escape.

Resp. Exh. 7, pp. 5-6. By the end of the day all five kidnappers had been arrested. "The victims were visibly shaken but physically unhurt." Id. at 6. The police later determined that the van used in the kidnapping had been stolen a few hours earlier. Id. at 8. The BPH noted that Jackson's version (which the BPH was not required to accept) was that he was the driver of the van, did not get in the victims' car, and did not possess a knife. RT 21.

The BPH determined that the kidnapping "was carried out in an especially cruel and callous manner" and showed a callous disregard for the suffering of another human being. RT 50. There were multiple victims, the offense was calculated, and the victims were mentally abused. Id.

<u>Prior Criminality/Unstable Relationships</u>:  The BPH also relied on Jackson's prior criminality and unstable relationships in reaching its decision. Although Jackson stated, "I don't have a criminal history," RT 21, the record indicated otherwise. As of his arrest for the current offense when he was 19 years old he had two items on his juvenile record and one arrest as an adult. As a juvenile, he had been charged with threatening a witness to change her testimony in January 1978. It was alleged that he went to a witness' home and told her not to testify or she would be beaten and raped. The charge was dismissed because necessary witnesses had moved out of state. Also as a juvenile, he had been charged with a November 1979 robbery, grand theft and receiving stolen property, which led to him being declared a ward of the state and put on home probation for which jurisdiction was terminated in July 1981. As an adult, he had been arrested on May 6, 1982 (just a couple of weeks before the kidnapping) for grand theft auto, but there was no disposition shown for that charge. See Resp. Exh. 7. pp. 3-4. In terms of unstable relationships, Jackson had used drugs (marijuana and PCP), considered himself an alcoholic and had been involved in a criminal street gang. RT 25-27, 29.

<u>Need For Further Programming</u>: The BPH determined that Jackson "has not sufficiently upgraded educationally and vocationally and he [has] not sufficiently participated in self-help programs." RT 51. The BPH found that Jackson needed to immerse himself "in positive kinds

10

of programs such as self-help programs, substance abuse programs, anger management programs; all the kinds of programs that would enable you to be able to face, discuss, understand, and cope with stress in a non-destructive manner." RT 52. The BPH commended him for being disciplinary-free since 1999 but cautioned him that he had to continue to be disciplinary-free. This was a reference to his extensive disciplinary history, in which he had received seventeen CDC-115 rule violation reports (the last of which was in 1999) and sixteen CDC-128a counseling chronos (the last of which was in 2000). RT 30. Many of these disciplinary charges were quite serious, as he had lost time credits for several of the disciplinary charges – although they were mostly in the 1980s. Significantly, however, he received a 360-day loss of credits and a SHU term in 1997 for possession of a slashing instrument. Resp. Exh. 8. Jackson had not obtained his GED in the many years he had been in prison. RT 30. His counselor's report was not favorable.

<u>Psychological Report Issues</u>: The BPH believed that the "[r]ecent psychological evaluation is basically inconclusive" and requested a new one that would provide information about his violence potential and current mental health programming that the BPH needed for its evaluation of the candidate. RT 51, 53. The need for a more pertinent psychological report was not simply a makeweight reason to deny parole: Jackson had a significant mental illness history and currently was in the CCCMS (correctional clinical case management system, a program for dealing with less seriously mentally ill inmates) and taking psychotropic medications. <u>See</u> RT 6. He also had been housed at Atascadero State Hospital for a few years. <u>See</u> RT 29, 40; Resp. Exh. 9, p. 3. His 2001 psychiatric evaluation stated that Jackson reported that "he was plagued by auditory hallucinations and racing thoughts," and had been diagnosed years earlier as having schizophrenia, paranoia with hallucinations and depression. Resp. Exh. 9, p. 3. In 2001, his Axis I diagnoses were "substance induced psychotic disorder (phencyclidine) with hallucinations," "depressive disorder, NOS," and "polysubstance dependence, in controlled environment." <u>Id.</u> at 4. The assessment of violence potential was "above average." <u>Id.</u> at 5.

2.    <u>Analysis Of Federal Claim</u>

11

1    The state courts upheld the BPH's decision in orders that had one- or two-sentence
2 rejections of the "some evidence" claim. Although it can be determined that the California Court
3 of Appeal applied the correct standard of "some evidence" by virtue of its mention of that
4 standard, there is no other analysis in the order. A review of the record is the only means of
5 deciding whether the state court's decision was objectively reasonable. See Plascencia v.
6 Alameda, 467 F.3d 1190, 1197-98 (9th Cir. 2006).

7    The BPH considered circumstances and factors proper under California law. A
8 circumstance tending to indicate unsuitability for parole is that "the prisoner committed the
9 offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2281(c)(1).
10 There were multiple victims kidnapped at gun-point and the motive was trivial. See id. at §
11 2281(b)(1)(A & E). An inmate's prior record of violence and unstable social history may be
12 considered, id. at § 2281(c)(2 & 3). Even if Jackson's criminal record was not considered to be
13 violent so as to fit under § 2281(c)(2), it could be considered under § 2281(b), which allows
14 consideration of the inmate's "past criminal history, including involvement in other criminal
15 misconduct which is reliably documented." Jackson's institutional behavior and psychological
16 factors could be considered under § 2281(c)(5 & 6) or § 2281(b). The BPH's ultimate
17 conclusion was cast in terms of the requirement of California law, i.e., that Jackson "would pose
18 an unreasonable risk of danger to society or a threat to public safety if released from prison."
19 RT 50; see Lawrence, 44 Cal. 4th at 1191.

20    Jackson suggests that the BPH's determination that his commitment offense was
21 especially cruel and callous was unsupported because neither of the victims was physically
22 harmed. See Petition, p. 6a; Traverse, p. 7. Physical harm does not need to occur. That there
23 were two victims attacked by Jackson and his crime partners is enough to make the kidnapping
24 one that is considered "especially heinous, atrocious or cruel." 15 Cal. Code Regs. §
25 2281(c)(1)(A). Also, he does not dispute that the motive was very trivial in relation to the
26 kidnapping. Id. at § 2281(c)(1)(E). To the extent Jackson is suggesting this was not a serious
27 crime, the BPH reasonably rejected that view: two women were forced to drive away from a
28 place of safety at gunpoint and knife point, then put in a van against their will, and then told to

1 disrobe. The kidnapping only ended when police gave chase and the van in which the victims
2 were being transported crashed into a tree.

3    Jackson urges that there is no support for the determination that he needs further mental
4 health therapy. He states that his "mental stability is excellent and that he has successfully
5 completed numerous therapy groups." Petition, p. 6a. The BPH did not specifically state that
6 he needed to do further mental health therapy, but instead that he needed to participate in self-
7 help programs such as "self-help programs, substance abuse programs, Anger Management
8 Programs" and other programs that would help him "face, discuss, understand, and cope with
9 stress in a non-destructive manner. The kinds of programs that would help you make good
10 decision, good choices." RT 52. These are of the same sort required for most parole applicants
11 regardless of whether they have a mental illness. Further, Jackson is incorrect insofar as he
12 suggests his mental health problems are a thing of the past, see Traverse, p. 8; he is in a mental
13 health care program (CCCMS), is taking psychotropic medications, and has current major mental
14 illness diagnoses. While his mental illnesses may be under control with this help, there is no
15 support in the record for Jackson's suggestion that they have ended.

16    Jackson states that he had no other adult commitments and disputes that there have been
17 previous attempts to correct his criminality. Traverse, p. 6. This argument gives a misleading
18 picture of him as having committed only this one offense. Jackson had been arrested for grand
19 theft of an auto just a couple of weeks before the kidnapping. That charge apparently was not
20 pursued once he was arrested for the current kidnapping, but that does not mean he had no adult
21 criminal history. His assertion that there were no previous attempts to correct his criminality
22 ignores the fact that he was twice put on probation while a juvenile. Although he was only 19
23 when he committed the kidnapping, his criminal record was not a clean slate.

24    Finally, Jackson tries to downplay the most recent disciplinary offense. He states that the
25 CDC-115 he received in 1999 was an administrative CDC-115, "of minor consequence," and
26 does not show him to be unsuitable for parole. Traverse, p. 7. This CDC-115 was not his only
27 CDC-115, but was his seventeenth one. As mentioned earlier, Jackson had several CDC-115s
28 that involved loss of credits because of more serious offenses. Indeed, his 1997 CDC-115

resulted in a SHU term and a 360-day loss of time credits for possession of a slashing instrument. Even if one accepted his dubious assertion that the 1999 CDC–115 didn't count as "serious misconduct" under § 2281(c)(6), it could be considered under § 2281(b), which provides that "[a]ll relevant, reliable information available to the board shall be considered in determining suitability for parole."

Bearing in mind that the court's chore is to consider not whether some evidence supports the reasons, but whether some evidence supports the conclusion that his release unreasonably endangers public safety, this court concludes that there was some evidence to support the BPH's conclusion that Jackson's release would pose an unreasonable risk of danger to society if released from prison in 2005, some 23 years into his life sentence. The BPH did not rely solely on his commitment offense, or even on just things that occurred prior to this incarceration but instead relied on those plus various shortcomings while he was in prison to make its assessment. The California Court of Appeal's rejection of Jackson's insufficient evidence claim was not contrary to or an unreasonable application of the <u>Superintendent v. Hill</u> some evidence standard. Jackson is not entitled to the writ.

## CONCLUSION

For the foregoing reasons, the petition is denied. The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 31, 2009

                                                  SUSAN ILLSTON
                                         United States District Judge